UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
    ENGLAND ADAMS,

                                 Plaintiff,

              -against-

ROBERT BEAUDOUIN, M.D., PETER
GOLDSTEIN, M.D., SIXTO RIOS, CAMERON
LINDSEY, *as Warden of the Metropolitan Detention
Center*, RAUL CAMPOS, *as Health Services
Administrator of the Metropolitan Detention Center*,
ASIAMEL CRUZ, *as Unit Secretary*, ROLANDO
NEWLAND, *as Clinical Director*,

                                Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**09-CV-2136 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff England Adams ("Adams") brings this action pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), alleging that various employees of the Metropolitan Detention Center ("MDC") in Brooklyn, New York, violated his Fifth and Eighth Amendment constitutional rights. (Compl. (Docket Entry # 1).) Specifically, Adams claims that Defendants exhibited deliberate indifference to his complaints of pain stemming from an inguinal hernia. (Id. ¶ 2.) On March 16, 2010, Adams stipulated to dismissing all claims against Defendants in their official capacities. (Docket Entry # 18.) Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. (Defs.' Mot. (Docket Entry # 22).) As set forth below, the court denies Defendants' motion for summary judgment, without prejudice, and directs the parties to engage in discovery regarding Defendants' assertions of qualified immunity.

I.  STANDARD OF REVIEW

On a motion for summary judgment, the court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[1] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

II.  BACKGROUND

On March 22, 2006, Adams was confined at MDC as a pretrial detainee. ("Consol. 56.1" (Docket Entry # 24-1) ¶ 1.) Plaintiff asserts, and Defendants dispute, that Adams first complained of pain in his groin on or around October 15, 2006. ("Pl.'s 56.1" (Docket Entry # 23-1) ¶ 11.) Nonetheless, both parties admit that Adams complained of pain and numbness in his right groin area by November 30, 2006. (Consol. 56.1 ¶ 11.) On the same day, a "mid-level practitioner" diagnosed Adams with a "reducible small right inguinal hernia" and prescribed ibuprofen to Adams. (Id. ¶ 12.) The mid-level practitioner instructed Adams not to push or lift heavy objects. (Id. ¶ 13.) Adams asserts that he was not told of the diagnosis and that the ibuprofen did not alleviate his pain. (Pl.'s 56.1 ¶ 12.)

---

[1] This quote reflects the amendments to Federal Rule of Civil Procedure 56, which became effective December 1, 2010.

2

On December 12, 2006, Defendant Dr. Robert Beaudouin ("Beaudouin") examined Adams after Adams had performed 300 sit-ups and experienced pain in his right pubic area. (Consol. 56.1 ¶¶ 14, 15.) Beaudouin noted that he noticed no "perceptible inguinal hernia," diagnosed Adams with a muscle sprain, and prescribed him Naprosyn, a pain reliever. (Id. ¶ 16.) Adams states that, in fact, he was suffering from a hernia at the time. (Pl.'s 56.1 ¶ 16.) On December 14, 2006, Adams was issued a "bottom bunk pass" so that he did not need to climb into a top bunk. (Consol. 56.1 ¶ 17.)

On January 24, 2007, Adams was examined by an MDC physician's assistant. (Id. ¶ 18.) Adams complained to her that his pain ranked ten on a scale of one to ten, denied any recent trauma, and stated that the Naprosyn prescribed to him by Beaudouin was not working. (Id. ¶ 19.) The physician's assistant issued him a hernia belt, explained to Adams how to use it, and prescribed ibuprofen to him. (Id. ¶ 20.) Adams asserts that the hernia belt was "not the correct belt for his type of hernia." (Pl.'s 56.1 ¶ 20.)

On March 9, 2007, Beaudouin saw Adams for a follow-up examination, and Adams again complained of right inguinal hernia pain. (Consol. 56.1 ¶ 21.) Beaudouin diagnosed Adams with a reducible right inguinal hernia, prescribed Motrin to Adams, and explained to Adams again how to use his hernia belt. (Id. ¶ 22.) Adams asserts that Beaudouin told him that the hernia belt was not the correct type. (Pl.'s 56.1 ¶ 22.) On May 31, 2007, Beaudouin examined Adams again, and Adams again complained of pain and numbness in his right groin, and that he was now unable to sleep due to the pain. (Consol. 56.1 ¶¶ 25-27.) Beaudouin now noticed that Adams's hernia was noticeable when Adams was standing or coughing. (Id. ¶ 28.) Beaudouin again prescribed Naprosyn to Adams and "advised Adams that if he [was] unable to push in the hernia, he should notify Health Services." (Id. ¶ 30.)

On July 6, 2007, Defendant Dr. Peter Goldstein ("Goldstein") examined Adams. (Id. ¶ 36.) Adams "stated that his right hernia occasionally pops out and is painful and that Ibuprofen was not alleviating the pain." (Id. ¶ 38.) Goldstein diagnosed Adams with a "small, non-incarcerated reducible right inguinal hernia," and informed Adams that he must wear his hernia belt at all times. (Id. ¶¶ 38, 41.) Goldstein also informed Adams that "if Adams were designated to an institution soon, he might be able to have the hernia fixed once he arrived at the designated facility, but that if sentencing were delayed, [he] would refer [Adams] to Dr. Howard Beaton, an outside surgeon." (Id. ¶ 40.)

On July 18, 2007, Defendant Sixto Rios ("Rios"), an MDC physician's assistant, examined Adams. (Id. ¶ 42.) Rios noted that Adams suffered from a reducible right inguinal hernia and prescribed ibuprofen to Adams. (Id. ¶ 43.)

On August 3, 2007, Beaudouin again examined Adams. (Id. ¶ 44.) Adams again complained of right inguinal hernia pain, and told Beaudouin that he could not exercise or sleep on his side. (Id. ¶ 45.) Beaudouin now noticed that Adams's hernia visibly grew since his previous examination. (Id. ¶ 47.) Beaudouin informed Adams that he would follow up with the MDC's Clinical Director regarding surgically repairing Adams's hernia. (Id. ¶ 48.) Beaudouin told Adams to not exercise, prescribed Colace, a stool softener, to ease Adam's bowel movements, and submitted a surgical consult form regarding Adams's hernia. (Id. ¶¶ 49, 50.) On August 6, 2007, Beaudouin saw Adams again, and again prescribed Adams with analgesics and Naprosyn, the former of which Adams refused to take. (Id. ¶ 52.)

On August 8, 2007, MDC's Utilization Review Committee ("URC"), the committee responsible for "requests for outside medical and surgical procedures and 'limited value' treatments and procedures," evaluated Beaudouin's surgical consult. (Id. ¶¶ 53, 54.) "Limited

value" procedures, according to Defendants, are those for which "treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience." (Id. ¶ 58.) Defendants provide examples of other "limited value" medical procedures: "minor conditions that are self-limiting; cosmetic procedures (*e.g.*, blepharoplasty); or removal of non-cancerous skin lesions."[2] (Id.) The URC determined that a consultation for hernia surgery was "not clinically indicated," categorized Adams's medical condition as one of "limited value," and and did not approve Adams's request for surgery. (Id. ¶¶ 59, 60.)

On September 21, 2007, Beaudouin yet again examined Adams; Adams complained again about his hernia, told Beaudouin that he felt constant pain – a ten on a scale of one to ten – and that he could not sleep on the affected side. (Id. ¶¶ 66, 67.) Beaudouin noted that Adams's hernia had grown in size since his previous visit, prescribed Adams with Tylenol, and informed him that his hernia was reducible. (Id. ¶ 69.)

On September 27, 2007, Adams filed a Request for an Administrative Remedy (a BP-9 form) requesting surgery for his hernia. (Id. ¶ 72.) On October 16, 2007, Defendant Warden Cameron Lindsay[3] ("Lindsay") denied Adams's request, and explained that he was receiving appropriate care for his symptoms. (Id. ¶ 73.) Lindsay also explained that the URC had denied Adams's request for surgery because his hernia was "self reducing." (Id. ¶ 75.)

On November 1, 2007, Beaudouin again examined Adams; besides the pain in his right groin, Adams now complained of pressure and dropping of his right testicle and bloating. (Id. ¶ 77.) Beaudouin prescribed Naprosyn, Colace, and Gaviscon to Adams. (Id. ¶¶ 80, 81.) Beaudouin also discussed diet, management of the hernia, and medications with Adams. (Id.

---

[2] Blepharoplasty is commonly known as an "eye lift." See Random House Unabridged Dictionary, "blepharoplasty" (2011).
[3] Defendant Lindsay's name is misspelled in the caption as "Lindsey."

¶ 83.) On November 7, 2007, Beaudouin submitted a request for a surgical consult on behalf of Adams. (Id. ¶ 84.) On December 6th, 11th, and 14th of 2007, Beaudouin again examined Adams, Adams continued to inform Beaudouin about his constant pain, and Beaudouin prescribed Naprosyn, Gaviscon, Tylenol 3, Colace, and Percoset. (Id. ¶¶ 87-97.) On December 17, 2007, Adams was finally taken to an outside doctor for a surgical consultation, who recommended surgery. (Id. ¶ 98-99.) On December 18, 2007, Beaudouin submitted another request for hernia surgery; it was approved the following day. (Id. ¶ 100.) Adams's surgery was scheduled for January 2008, and Adams saw Beaudouin a number of times throughout December. (Id. ¶ 102-109.) Finally, on January 8, 2008 – over a year since Adams had first complained about right inguinal pain, nine months since Adams was first diagnosed with an inguinal hernia, and five months since Adams was first recommended for a surgical consultation – Adams received hernia surgery. (Id. ¶ 110.)

## III. DISCUSSION

Defendants argue that each of them are entitled to qualified immunity from Adams's suit. (Defs.' Mem. (Docket Entry # 22-1) at 12-14.) Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense which is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). Whether qualified immunity applies should be resolved at the earliest possible stage in litigation. See Hunter v. Bryant, 502 U.S. 224, 227 (1991). Qualified immunity "often can and should be decided on a motion for summary judgment." Castro v.

6

United States, 34 F.3d 106, 112 (2d Cir. 1994). Summary judgment may not be appropriate, however, if there are outstanding factual disputes in an inadequate record. See Anderson v. Creighton, 483 U.S. 635, 646-47 n. 6 (1987) (noting that discovery specifically tailored to the question of qualified immunity may be necessary before summary judgment); Castro, 34 F.3d at 112.

A district court deciding a question of qualified immunity faces two issues. "[A] court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009) (internal citations omitted). Second, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 816. The court may decide either of these issues first. Id. at 822 (abrogating Saucier v. Katz, 533 U.S. 194 (2001)).

### A. Clear Establishment of a Constitutional Right

The court first considers whether the allegedly trammeled upon constitutional right was "clearly established." See Pearson, 129 S. Ct. at 816. This analysis has two parts. First, the court must appropriately define the constitutional right at issue. "The Supreme Court has instructed courts encountering a qualified immunity defense to claimed violations of constitutional rights to consider carefully 'the level of generality at which the relevant 'legal rule' is to be identified.'" Zahrey v. Coffey, 221 F.3d 342, 348 (2000) (quoting Creighton, 483 U.S. 635, 639 (1987)). If the right is construed too generally – such as a "the right to due process of law" – qualified immunity would be meaningless; if the right is construed too narrowly, only specific acts that have been previously declared unconstitutional would entitle a plaintiff to suit. Id. The touchstone for the courts analysis should be the "context" of the alleged violation: "a

7

potentially recurring scenario that has similar legal and factual components." Arar v. Ashcroft, 585 F.3d 559, 572 (2d Cir. 2009).

Second, once the right is properly defined, the court must determine whether it was "clearly established." Under the "clearly established" prong, the court must sequentially address whether

> (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise;
>
> (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or
>
> (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000). A positive response to any of these inquiries obviates the need to address the remainder. Id.

### 1. Defining the Constitutional Right

Adams alleges that each of the Defendants violated his Fifth and Eighth Amendment constitutional rights by failing to appropriately treat his hernia despite his complaints of pain. (Compl. ¶¶ 59, 71, 81, 89, 96, 103.) Because Adams was a pre-trial detainee, rather than a convicted inmate, his constitutional claim arises under the Fifth Amendment's Due Process Clause rather than the Eighth Amendment's proscription against "cruel and unusual punishment." See Weyant v. Okst, 101 F.3d 845, 856 (1996). In the qualified immunity context, however, these two rights are identically analyzed. Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Therefore, the "potentially recurring scenario," see Arar, 585 F.3d at 572, that is legally and factually similar to Adams's constitutional claim is an instance where a federal defendant delays adequate treatment for a prisoner plaintiff's serious medical need. This parallels other instances where a prisoner plaintiff

8

was allowed to challenge a federal defendant's qualified immunity on the grounds that the defendant delayed in providing him with adequate medical treatment. See Hathaway v. Coughlin (Hathaway I), 841 F.2d 48, 50-51 (2d Cir. 1988) (two year delay in hip surgery); Farley v. Capot, 384 F. App'x 685, 686-87 (9th Cir. 2010) (two month delay in surgically removing cancerous tumor); Farrow v. West, 320 F.3d 1235, 1245-48 (11th Cir. 2003) (fifteen month delay for corrective dentures).

2. Clear Establishment of the Constitutional Right

The nascent state of Adams's suit, however, precludes the court from deciding whether Defendants acted against the backdrop of a "clearly established" constitutional right. It is true that the conduct attributed to Defendants, that is, unduly delaying an inmate adequate medical treatment, was constitutionally prohibited at the time it occurred. It has long been the rule that the Constitution proscribes prison officials' intentional delay of adequate medical care to prisoners. See Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). It has been longer still that prison officials have been prevented from choosing "easier and less efficacious" treatment options where fully corrective treatment are medically practicable. See Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974) (closing auricular wound, rather than reattaching prisoner's severed ear, potentially violated Eighth Amendment). This means that at the time of Adams's detention, it was "clearly established" that the Constitution prohibited prison officials from subjecting their wards to languorously long delays in providing required corrective medical treatment to serious injuries. See McKenna v. Wright, 386 F.3d 432, 436-37 (2d Cir. 2004); Smith v. Carpenter, 316 F.3d 178, 187-88 (2d Cir. 2003); Smith v. Grefinger, 208 F.3d 203, 206 (2d Cir. 2000); Hathaway v. Coughlin (Hathaway II), 37 F.3d 63, 67-69 (2d Cir. 1994). Defendants' alleged conduct, therefore, was prohibited by federal law, which was clearly established at the time Adams's was detained. See Cuoco, 222 F.3d at 109 (2d Cir. 2000).

9

But it is unclear whether the alleged delay attributed to the Defendants was "objectively legally reasonable in light of the legal rules that were clearly established at the time [they were] taken." See id. "Whether a defendant['s] conduct was objectively reasonable is a mixed question of law and fact." Manganiello v. City of New York, 612 F.3d 149, 164 (2d Cir. 2010) (quoting Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007)). "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999). Here, the parties contest a number of facts material to the reasonableness inquiry, including when Defendants were first aware of Adams's complaints of pain (Consol. 56.1 ¶ 11); whether Defendants issued the correct type of hernia belt to Adams or whether it fit properly (id. ¶ 117); whether Defendants improperly characterized his request for a surgical consult at Adams's URC (id. ¶ 122); and what role each Defendant performed, and had authority to perform, in treating Adams (id.). Crucial to the resolution of these issues, and absent from the parties' moving papers, is the extent of each Defendant's authority to do so. The court cannot pass on, for example, whether Goldstein's actions were legally reasonable without knowing what authority Goldstein had to recommend Adams for, or ensure that Adams received, hernia surgery. Without this information, the court cannot pass on whether each Defendant's actions – their treatment of Adams and their responsibility, if any, in the delay of his surgery – were "objectively legally reasonable."[4] Accordingly, the court will direct the parties to engage in limited discovery regarding these issues.

---

[4] Further, neither party has addressed in their papers the "legal rules," that is, the federal regulations or Bureau of Prisons Program Statements, regarding the treatment of medical conditions similar to Adams's.

### B.     Allegations of a Violation of a Constitutional Right

A plaintiff who seeks to vindicate his Fifth Amendment due process claim must prove that the defendants showed "deliberate indifference to [his] serious medical needs." Chance, 143 F.3d at 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104) (alteration in original). "The standard of deliberate indifference includes both subjective and objective components. First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" Id. "To be sufficiently serious the deprivation must contemplate 'a condition of urgency, one that may produce death, degeneration or extreme pain.'" Evering v. Rielly, No. 98-cv-6718 (DAB), 2001 WL 1150318, at *8 (S.D.N.Y. Sept. 28, 2001) (quoting Hathaway II, 37 F.3d at 66). Where the constitutional violation alleged is the delay of adequate medical treatment, "sufficient seriousness" should "focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone." Carpenter, 316 F.3d at 185. Second, to fulfill the subjective component, the plaintiff must show that the defendant knew of and disregarded an excessive risk to the plaintiff's health or safety. Chance, 143 F.3d at 703-704. While medical malpractice is not necessarily sufficient, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." Id. at 703.

#### 1.     Objective Prong of Deliberate Indifference

At this stage of the proceedings, it cannot be determined whether Defendants delayed providing Adams with medically adequate care. On one hand, Adams's inguinal hernia reportedly caused him extreme pain as he repeatedly and persistently informed Defendants. (See Consol. 56.1 ¶¶ 11, 15, 19, 22, 26, 37, 45, 51, 67, 77, 115.) Despite Adams's ailing, he did not receive hernia surgery until eight months after it began to visibly protrude from his belly. (Id. ¶ 28, 110.) By August 2007, Adams's pain from his hernia was severe enough that he was having difficulty sleeping. (Id. ¶ 45.) Defendants do not contest that, as Adams's hernia progressed, the

pain was so severe at times that it felt like "he was being stabbed by a knife . . . [and had] difficulty performing simple daily functions like sitting, standing, sleeping, and having bowel movements." (Id. ¶ 119.) Defendants even admit that prior to Adams's surgery, on medical forms provided to him by MDC, Adams rated his pain as a "ten" on a scale of one to ten – thirty-five times in a two month period. (Id. ¶ 115.)

Yet, Defendants continually treated Adams for his hernia. Adams saw medical professionals at MDC regarding his hernia at least eight times. (E.g., id. ¶ 14, 18, 21, 36, 42, 44, 66, 77.) Various Defendants issued him a hernia belt and showed him how to use it (id. ¶ 20), gave him a bottom-bunk pass so that he would not need to climb into a top bunk (id. ¶ 17), prescribed him a variety of pain-relieving medications (e.g., id. ¶¶ 87-97), and submitted requests for surgical consults on his behalf (id. ¶ 49, 50, 84, 100). Whether these actions by Defendants constituted adequate medical treatment or an unconstitutional delay cannot be determined without discovery on what, in fact, constituted adequate medical treatment. Without knowing more, it may equally be the case that Defendants did not delay Adams's medical treatment because they treated him in a medically adequate manner up to the point of surgery; or, that Defendants delayed the one form of necessary treatment by illegally choosing "easier and less efficacious" options. See Williams, 508 F.2d at 544. In discovery, the parties should also develop the evidentiary record concerning the medical adequacy of these treatments, and the timing of Adams's surgery given the duration and severity of his complaints of pain.

2.  Subjective Prong of Deliberate Indifference

It is also unclear, without discovery, whether Adams's claim meets the subjective prong of deliberate indifference. As an initial matter, and as discussed above, the court cannot tell whether any of the Defendants "disregarded" a risk to Adams's health or safety because the parties have not submitted evidence regarding the authority each Defendant had to recommend

Adams for surgery, or to ensure that he received greater treatment than that given. See supra Part III.A.2.

As for each Defendant's knowledge of Adams's treatment, the record is similarly scant. Beaudouin, for example, knew of Adams's condition because it was he who first diagnosed Adams's inguinal hernia and watched it grow in size in the year since Adams's first began complaining of abdominal pain. (Consol 56.1 ¶¶ 22, 118.) Beaudouin prescribed Adams's various pain relievers to alleviate his pain (see id. ¶ 116) and submitted multiple requests for surgical evaluation (id. ¶¶ 50, 100). Whether, however, Beaudouin nonetheless "disregarded an excessive risk" to Adams's health or safety is unclear. It is not clear why Beaudouin did not recommend surgery when he initially diagnosed Adams with a hernia on March 9, 2007. (Id. ¶ 22.) Nor is it clear what role Beaudouin had, if any, as part of the URC that deemed Adams's need for a surgical consult of "limited medical value." On the minutes of that URC meeting, Beaudouin is paradoxically noted in both the "Members" and "Not Present" columns. (Colvin Decl. (Docket Entry # 22-3) Ex. 2 at US_0065.) Further, it is unclear why Beaudouin had difficulty approving Adams's request for a surgical consult when, on December 18, 2007, he was able to submit a request for Adams's hernia surgery that was approved the following day. (Consol. 56.1 ¶ 100.)

Similarly, while Defendant Goldstein was aware of the pain Adams suffered due to his hernia (see id. ¶ 38), it is unclear whether he disregarded any attendant risks to Adams's health and safety. The parties do not dispute that Goldstein believed that Adams needed surgery when he examined him on July 6, 2007 because Goldstein told Adams that he might be able to have his hernia "fixed" at his designated correctional institution, or by an outside surgeon if his sentencing was delayed. (See id. ¶ 40.) Further Goldstein was listed as a "member" of the URC

13

that denied Adams's request for a surgical consult. (Colvin Decl. Ex. 2 at US_0065.) What recommendations Goldstein made at that meeting is not known from the recorded minutes. What other steps, if any, Goldstein took to treat or attempt to treat Adams is unclear.

Regarding Defendants Rios and Campos, they too knew that Adams suffered from a hernia. (Consol. 56.1 ¶¶ 43, 124.) Because the parties have yet to engage in discovery, there is simply not yet evidence to prove or disprove that either Defendant disregarded a risk to Adams's health or safety. The same goes for Defendant Cruz, who was present at Adams's URC: Defendants claim, and Adams states that he lacks sufficient information to admit or deny, that Cruz was at the URC solely for the purpose of taking notes. (Id. ¶ 56.) Discovery is needed on this issue as well. The record is also wholly unclear as to what knowledge Defendant Lindsay personally had regarding Adams's condition, or whether his actions involving his letter to Adams about the URC's denial of his request for a surgical consult stemmed from a disregard for Adams's health. (Id. ¶ 75)

Lastly, Defendant Newland, the Clinical Director of MDC (id. ¶ 8), was present at Adams's URC. (Id. ¶ 122; Colvin Decl. Ex. 2 at US_0065.) What information Newland knew about the severity of Adams's condition, what recommendations he made based on what he knew, and whether Newland disregarded the risks arising from Adams's inguinal hernia is not known from the scant evidence presented on Defendants' motion for summary judgment. Discovery will need to be taken on all these issues to resolve the question of Defendants' claim for qualified immunity. See Creighton, 483 U.S. at 646-47 n. 6.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is DENIED without prejudice. The court directs the parties to engage in limited discovery regarding Defendants' assertion of qualified immunity, and refers the parties to Magistrate Judge Bloom. The parties should inform the court when discovery on this issue is completed.

SO ORDERED.

Dated: Brooklyn, New York
      January 24, 2011

NICHOLAS G. GARAUFIS
United States District Judge